## Case No. 2,602.

### The CHAPMAN.

[4 Sawy. 501.][1]

District Court, N. D. California. Jan. 13, 1864.

#### PRIZE OF WAR—PIRACY.

1. Where a vessel was fitted out within a loyal state, for the purpose of cruising against the commerce of the United States, under a letter of marque, issued by the government of the so-called Confederate States, and was seized, libeled and condemned on the instance side of the court: *Held*, that the officers and crew of a United States man-of-war, who aided in the seizure, were not entitled, under the act of April 23, 1800 [2 Stat. 52], to a share of the proceeds as prize of war.

2. Neither were they entitled to such share under the act of August 5, 1861 [12 Stat. 314], as of a vessel fitted out for the commission of acts of piracy—the piracy referred to in that act being piracy under the laws of nations.

[In admiralty. Libel by the officers and crew of the United States vessel Cyane to recover one-half of the proceeds of the schooner Chapman.]

W. H. Sharp, U. S. Atty., and Alex. Campbell, for claimant.

B. S. Brooks and J. McHenry, for officers and crew.

HOFFMAN, District Judge. Late in the month of February, 1863, the revenue officers at this port were informed that certain persons in this city were engaged in fitting out the schooner Chapman as a privateer, to cruise under the flag of the Confederate States, against the commerce of the United States. A search for the schooner was at once instituted, and on ascertaining where she lay, detective officers were placed on watch, with instructions to report everything that took place on board of her either in the daytime or during the night. She shortly afterward commenced receiving cargo, amongst which were some very heavy cases, subsequently ascertained to contain guns.

On the fourteenth of March the vessel was cleared at the custom-house, and the authorities became satisfied that her preparations were completed and that she was about to sail. Fearing that she might attempt to get to sea at high tide in the evening, a steam-tug was chartered and placed, with fires banked, in an adjoining slip, ready to start at a moment's notice. On board of her were the collector, the naval officer and the surveyor, together with Mr. Lees, a detective officer, and a squad of policemen. No movement was made by the schooner during the night, but a large number of persons were observed to go on board of her and conceal themselves in the hold. About daylight, the crew of the schooner commenced loosening her fasts and hauling out beyond a vessel that lay near. She shortly afterward went further out into the stream, and began to hoist her jib and mainsail. About ten days previously, information of what was going on had been communicated by the revenue officers to Colonel Drum, adjutant-general of this department, and an order had been obtained from him, directing Captain Winder, commanding Fort Alcatraz, to receive and hold as prisoners any persons whom the revenue officers might bring to the island. There being no revenue cutter then on this station, Captain Shirly, of the United States ship Cyane, was also applied to by the collector and surveyor, and a written order to his executive officer was obtained, directing him to furnish two boats' crews of armed men at any hour of the day or night that they might be called for by the custom-house authorities. An arrangement was accordingly made between the officer of the deck of the Cyane and Messrs. Farwell and McLean, who visited him for that purpose on the night of the fourteenth, that if the vessel should drop out from the slip, and there should be no indications of the presence of the custom-house officers, the boats should be dispatched and the vessel seized.

The schooner having dropped out, as has been stated, and the steam-tug not having moved, the boats of the Cyane were manned and started for the schooner. These proceedings were observed from the tug; but at that moment a person appeared on the wharf and hailed the schooner, and the custom-house officers, being desirous of arresting all the persons concerned in the enterprise, delayed, for a short time, the steam-tug, in order to give an opportunity to this person to get on board. Not having heard the hail, the Cyane's boats continued their course, and arriving first at the schooner, boarded and took possession of her. About ten or fifteen minutes afterward, the tug, with the custom-house officers and police officers, came alongside. A search of the vessel and of the persons of the crew was immediately made, and the vessel was towed by the tug to Fort Alcatraz. These proceedings seem to have been conducted under the exclusive direction of the custom-house offi-

---

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

cials, who assumed entire control. The Cyane's boats returned to the ship, leaving, however, an officer and four men on board the Chapman. On reaching Alcatraz, the prisoners were landed and turned over to Captain Winder. The vessel was then unladen, and was subsequently towed up and anchored under the guns of the Cyane.

At the next term of the circuit court, indictments against the prisoners were found, and three of the principal offenders were tried, convicted and sentenced. The vessel was also libeled in the district court as forfeited to the United States, under the acts of August 5 and August 6, 1861. No claim was interposed, and she was condemned by default, sold, and her proceeds brought into the registry for distribution. At this stage of the proceeding, the commander of the Cyane, Paul Shirly, intervened, claiming for himself and his officers and men a share of the fund.

Without dwelling on the somewhat peculiar circumstances under which the seizure of the vessel was effected, or on the fact that no proceedings to condemn her or her cargo as a prize of war have been instituted, I proceed to consider the grounds on which the alleged captors base their claim to a moiety of the proceeds. These are: 1. That the vessel and cargo were enemies' property, and, therefore, good prize of war; and, 2. That the captors are entitled to a moiety of the proceeds under the provisions of section 1 of the act of August 5, 1861, entitled "An act supplementary to an act entitled an act to protect the commerce of the United States and to punish the crime of piracy."

1. Is the vessel and cargo to be considered enemies' property? It is not to be questioned; since the recent decisions of the supreme court, that a civil war, with all the consequences to the residents of the seceded states of a public territorial war, or a bellum inter gentes has existed in this country since the act of July, 1861 [12 Stat. 283], by which its existence was recognized. The minority of the judges dated its commencement from that time, as they deemed an act of congress essential, under the constitution, to create a state of war, and that until the legislature acted, the hostile proceedings were to be regarded as an insurrection, for which the guilty parties alone were to be held personally responsible. The majority of the judges held that civil war was a material fact which the court was bound to notice, and that the proclamations of blockade by the president were a recognition of a state of war as actually existing. But the court was unanimous in regarding the war as existing in a legal sense, with all the consequences of war, both as respects the belligerents and neutrals from the date of the act of congress referred to. In the exercise of the belligerent rights thus created, the United States have established blockades, exercised the right of search, author-ized the capture and condemnation of neutrals carrying contraband or attempting to run the blockade, and declared liable to seizure and confiscation the property of the de facto residents of the so-called Confederate States as enemies' property, irrespective of the personal conduct or sentiments of the owners. The rules of war have also been applied to the conduct of military and naval operations—the prisoners captured have been held as prisoners of war, and a cartel has been agreed on providing for their exchange, and including those taken on regularly commissioned privateers, as well as in the land forces of the enemy.

But while thus yielding to the inexorable fact, and conceding the rights of belligerents to the insurgents, in this deplorable civil war, it cannot be pretended that they or their adherents have any other or further rights than those of belligerents in an international war or a bellum inter gentes. All persons who voluntarily reside within the dominions of a sovereign and accept the protection of his laws, owe to him an allegiance. If they conspire against his authority and levy war upon him, or give aid and comfort to his enemies, they are traitors, not enemies, and are punished, not jure belli, but by the exercise of the municipal right inherent in every sovereign within his own territory over those who receive his protection. The persons, therefore, who in this case, in a loyal state, and within the undisputed territory of the United States, set on foot a hostile enterprise, and engaged in the existing rebellion, were justly dealt with as traitors, not enemies, and the instruments intended to be used in the prosecution of their guilty design were properly libeled on the instance side of the court as forfeited to the United States for breach of its municipal laws. It is therefore clear that the claim of the petitioners, under the act of April 13, 1800, which gives to the captors a portion of the proceeds of all vessels and goods "which shall be adjudged good prize," is wholly inadmissible; for the Chapman and her cargo have not been so adjudged, nor could they have been, had a proceeding for that purpose been instituted.

2. But it is contended that the petitioners are entitled to a moiety of the proceeds under the first section of the act of August 5, 1861. That section provides, that "any vessel or boat which shall be built, purchased, fitted out in whole or in part, or held for the purpose of being employed in the commission of any piratical aggression, search, restraint, depredation, or seizure, or in the commission of any other act of piracy, as defined by the law of nations, shall be liable to be captured and brought into any port of the United States, if found upon the high seas, or to be seized if found in any port or place within the United States, whether the same shall have actually sailed upon any piratical expedition or not, and whether any act of

piracy shall have been committed upon or from such vessel or boat or not; and any such vessel or boat may be adjudged and condemned, if captured by a vessel authorized, as hereinafter mentioned, to the use of the United States, and to that of the captors; and if seized by a collector, surveyor, or marshal, to the use of the United States, after due process and trial in like manner as is provided in section four of the act to which this act is supplementary, which section is hereby made in all respects applicable to cases arising under this act."

The act of March 3, 1819 [3 Stat. 512], subjected to capture only those vessels or boats which should commit or attempt any piratical aggression, search, restraint, depredation or seizure, while the supplementary act of 1861 subjects to capture on the high seas, and to seizure in port, vessels built, purchased, fitted out, in whole or in part, or held for the purpose of being employed in the commission of any such piratical aggression, search, restraint, etc. It is plain that the piratical acts contemplated in both statutes are the same, the only difference between the acts being, that the earlier statute extends only to vessels which have committed or attempted them, while the later statute includes vessels intended to be employed in committing them. That the offenses thus referred to are such only as would be deemed piratical under the laws of nations, is, 1 think, evident from the language of both statutes.

The second section of the act of 1819, authorizes the capture of any vessel which shall have committed or attempted any piratical aggression upon any vessel of the United States, or the citizens thereof. or upon any other vessel. The authority here given is not merely over vessels of the United States, or over citizens of the United States, but it is extended over all vessels guilty of piratical aggressions upon vessels of the United States, or the citizens thereof, or upon any other vessel. It cannot be presumed that congress meant to direct the capture of a foreign vessel and crew, for an aggression on the high seas upon another foreign vessel, unless the aggression was piratical under the laws of nations—an offense of which any nation may take cognizance.

The third section, while it authorizes the commander and crew of any merchant vessel of the United States to resist any piratical aggression made upon her, and to retake any United States vessel which may have been unlawfully seized, expressly excepts seizures by public armed vessels of nations in amity with the United States, thus indicating that the seizures referred to are piratical seizures jure gentium, and not seizures by commissioned national vessels, however irregular or unlawful the latter may be.

The fifth section provides that "if any person or persons whosoever shall, on the high seas, commit the crime of piracy, as defined by the laws of nations," etc., every such offender shall, on conviction, be punished with death. The piracy here referred to is thus expressly declared to be piracy, "as defined by the laws of nations," and it is reasonable to suppose that it is the same crime as those referred to in the preceding sections for the commission, or attempt to commit which, vessels were made subject to capture, either by public or private vessels of the United States.

The act of 1861 describes the vessels which it makes liable to capture or seizure, as those which shall be built, purchased, fitted out, or held for the purpose of being employed in the commission of any piratical aggression, search, depredation, or seizure, or in the commission of any other act of piracy, as defined by the laws of nations. This act is expressly declared to be supplementary to the act of 1819, and the description of the piracy in the last clause of the section cited, when taken in connection with the language of the earlier statute, indicates that the aggressions, seizures, etc., referred to, were such only as under the laws of nations would be piratical. It is to be noted, also, that the vessels described are those built, fitted out, etc., for the purpose of being employed in the commission of any piratical aggression, etc. It is not necessary that they should have been fitted out by American citizens, or in American ports, nor that the intended aggression should be upon American vessels or citizens. In thus authorizing the capture on the high seas of all vessels, whether American or foreign, fitted out or held for the commission of piracy, congress must be presumed to have referred to vessels designing to commit crimes, of which, if consummated, the United States could have taken cognizance. This they clearly could not do of an act not amounting to piracy under the laws of nations, committed by foreigners, in a foreign vessel, on the high seas, in regard to another foreign vessel. It is probable, however, that the fitting out, etc., referred to is a fitting out within the United States, or of an American vessel; for it is not perceived, by what authority the United States can direct the capture, on the high seas, of a foreign vessel, which has been fitted out and held in a foreign port, for piratical purposes, unless she is, at the time of her capture, on a piratical cruise, and is a pirate under the laws of nations.

Construing, then, the act of 1861 to refer to aggressions, depredations, etc., which are piracies, as defined by the laws of nations, the inquiry arises, was the enterprise in which the Chapman was engaged of that character? It appeared in proofs that the parties who originated the plan were provided with a blank letter of marque, issued by the authorities of the so-called Confederate States. Their design was to sail from this port with guns, ammunition, etc., on

board their vessel, and a crew sufficient to man a privateer. They were first to proceed to the island of Guadalupe, where the guns, ammunition, and men were to be landed. The vessel was then to go to Mazatlan, for which port she had been cleared at the custom-house; and, having delivered her cargo, filled up her letter of marque, and transmitted a copy of her crew list, etc., to the rebel authorities, to return to Guadalupe, take her armament on board, hoist the Confederate flag, and proceed on her cruise against the vessels of the United States.

In the celebrated argument by Mr. (afterward Chief Justice) Marshall, in the Robbins Case [Case No. 11,878], it is said: "In truth, the right of every nation to punish, is limited in its nature to offenses against the nation inflicting the punishment. This principle is believed to be universally true. It comprehends every possible violation of its laws on its own territory, and it extends to violations committed elsewhere, by persons it has a right to bind. It extends, also, to general piracy. A pirate, under the laws of nations, is an enemy of the human race. Being the enemy of all, he is liable to be punished by all. Any act which denotes this universal hostility, is an act of piracy. Not only an actual robbery, therefore, but cruising on the high seas without commission, and with intent to rob, is piracy. This is an offense against every nation, and is, therefore, alike punishable by all. But an offense, which in its nature only affects a particular nation, is only punishable by that nation. It is by confounding general piracy with piracy by statute, that indistinct ideas have been produced, respecting the power to punish offenses committed on the high seas. A statute may make any offense piracy, committed within the jurisdiction of the nation passing the statute, and such offense will be punishable by that nation. But piracy, under the law of nations, which alone is punishable by all nations, can only consist in an act which is an offense against all. No particular nation can increase or diminish the list of offenses thus punishable."

In the case of U. S. v. The Malek Adhel [2 How. (43 U. S.) 210], a construction of the word "piratical," used in the act of 1819, and repeated in that of 1861, was given by the supreme court: "Where the act uses the word 'piratical,' it does so in a general sense, importing that the aggression is unauthorized by the laws of nations, hostile in its character, wanton and criminal in its commission, and utterly without any sanction from any public authority or sovereign power. In short, it means that the act belongs to the class of offenses which pirates are in the habit of perpetrating, whether they do it for purposes of plunder, or for purposes of hatred, revenge, or wanton abuse of power.

"A pirate is deemed, and properly deemed, hostis humani generis. But why is he so deemed? Because he commits hostilities upon the subjects and property of any or all nations, without any regard to right or duty, or any pretense of public authority. If he willfully sinks or destroys an innocent merchant-ship, without any other object than to gratify his lawless appetite for mischief, it is just as much a piratical aggression, in the sense of the law of nations and the act of congress, as if he did it solely and exclusively for the sake of plunder—lucri causa. The law looks to it as an act of hostility, and, being committed by a vessel not commissioned and engaged in lawful warfare, it treats it as the act of a pirate, and of one who is emphatically hostis humani generis." 2 How. [43 U. S.] 232.

In Palmer's Case, 3 Wheat. [16 U. S.] 610, it was held by the supreme court that the crime of robbery, committed by a person who is not a citizen of the United States, on the high seas, on board of a ship belonging exclusively to subjects of a foreign state, is not piracy under the act, and is not punishable in the courts of the United States. It was also held that when a civil war rages in a foreign nation, one part of which separates itself from the old established government, and erects itself into a distinct government, the courts of the United States must view such newly constituted government as it is viewed by the legislative and executive departments of the government of the United States. If that government remains neutral, but recognizes the existence of a civil war, the courts cannot consider as criminal those acts of hostility which war authorizes and which the new government may direct against its enemy.

In a subsequent case (U. S. v. Klintock, 5 Wheat. [18 U. S.] 152), it was held that robbery committed by any persons on board of a vessel not at the time belonging to the subjects of any foreign power, but in possession of a crew acting in defiance of all law, and acknowledging obedience to no government whatever, is within the meaning of the act, and is punishable in the courts of the United States. "The general terms of the act," says Mr. Chief Justice Marshall, "ought not to be applied to offenses against the particular sovereignty of any foreign power, but we think they ought to be applied to offenses committed against all nations, including the United States, by persons who, by common consent, are equally amenable to the laws of all nations."

This distinction between piracies under the laws of nations, which are everywhere justiciable, and those offenses to which that term has been arbitrarily applied by the municipal codes of particular nations, and which are therefore only cognizable before the tribunals having jurisdiction either territorial, actual, or implied, or over the person of the offender, is recognized not only in numerous

cases, but by all writers on international law. See Lawr. Wheat. 247, in notis.

All agree that piracy, under the laws of nations, is the offense of depredating on the seas without authority or commission from any sovereign or belligerent state. It is the act of outlaws and rovers, in defiance of all law, and acknowledging no law whatever. A person, therefore, who commits hostilities under a commission from a party to a recognized civil war, is not guilty of piracy. He stands in the same position as if he held a commission from an established government, so far, at least, as regards all the world except the other party to the contest; nor will even any irregularity as to acts done jure belli, fix the character of a pirate upon him. "His acts may be unlawful; when measured by the laws of nations or treaty stipulations, the individuals concerned in them may be treated as trespassers, and the nation to which they belong may be held responsible; but the parties concerned are not guilty of piracy." Op. Mr. Butler, 3 Op. Atty'. Gen. 121.

It is to be observed that this opinion was given in a case of capture, by a Texan armed and commissioned schooner, of a United States vessel engaged in supplying contraband goods to the army of Mexico, at a time when a state of civil war existed between Texas and Mexico, but before the independence of the former had been recognized by the United States. The principle thus laid down is in entire accordance with the claims and the concessions of the United States in similar cases—and with the practice of foreign nations. Thus, even before our own formal declaration of independence, France and Spain opened their ports to the North American colonists and treated them as an independent people. Their private as well as their public cruisers were not only admitted into the ports of those countries, but the same friendly disposition was manifested by all the other European powers except Portugal. Ann. Reg. 1776, p. 182.

In 1779 the states general refused to deliver up to England prizes brought into the Texel by Paul Jones; and for many years afterward compensation was persistently demanded from Denmark by the United States for three prizes carried by Paul Jones into a port of Norway, then under the government of Denmark, by whom they were delivered up to England. So, too, during the existence of the civil war between Spain and her colonies, and previous to the acknowledgment of the independence of the latter by the United States, the colonies were deemed by them belligerent nations, and entitled to all the sovereign rights of war against their enemy. U. S. v. Palmer, already cited; The Divina Pastora, 4 Wheat. [17 U. S.] 52; The Santissima Trinidad, 7 Wheat. [20 U. S.] 287.

During the Greek revolution the same course was pursued by England. To a complaint of the porte against allowing the Greeks belligerent rights, Mr. Canning replied that "the character of belligerency was not so much a principle as a fact; that a certain degree of force and consistency acquired by a mass of population engaged in war entitled that population to be treated as belligerents, and even if their title was questionable, rendered it the interest of all civilized nations so to treat them."

The same principles are emphatically recognized by the supreme court in the recent cases of The Hiawatha, Amy Warwick, etc., 2 Black [67 U. S.] 638. "War," says Mr. Justice Grier, delivering the opinion of the court, "has been well defined to be 'that state in which a nation prosecutes its right by force.' The parties belligerent in a war are independent nations. But it is not necessary to constitute war that both parties should be acknowledged as independent nations or sovereign states. A war may exist where one of the belligerents claims sovereign rights as against the other. * * * When the party in rebellion occupies and holds, in a hostile manner, a certain portion of territory, have declared their independence, have cast off their allegiance, have organized armies, have commenced hostilities against their former sovereign, the world acknowledges them as belligerents and the contest a war. * * * The laws of war as established among nations have their foundation in reason, and all tend to mitigate the cruelties and misery produced by the scourge of war. Hence the parties to a civil war usually concede to each other belligerent rights. They exchange prisoners, and adopt the other courtesies and rules common to public or national wars. 'A civil war,' says Vattel, 'breaks the bands of society and government, or at least suspends their force and effect; it produces in the nation two independent parties, who consider each other as enemies and acknowledge no common judge. Those two parties, therefore, must necessarily be considered as constituting at least for a time, two separate bodies, two distinct societies. Having no common superior to judge between them, they stand in precisely the same predicament as two nations who engage in a contest and have recourse to arms. This being the case, it is very evident that the common laws of war—those maxims of humanity, moderation and honor —ought to be observed by both parties in every civil war. Should the sovereign conceive that he has a right to hang up his prisoners, the opposite party will make reprisals, etc., etc.; the war will become cruel and horrible, and every day more destructive to the nation.'" The court further observes: "It is not the less a civil war with belligerent parties in hostile array, because it may be called an 'insurrection' by one side, and the insurgents be considered as rebels and traitors. It is not necessary that the independence of the revolted province or state be

acknowledged in order to constitute it a party belligerent in war according to the laws of nations."

The same principles are also recognized in the dissenting opinion of Mr. Justice Nelson: "In the case of a rebellion or resistance by a portion of the people of a country against the established government, there is no doubt that, if in its progress and enlargement the government thus sought to be overthrown sees fit, it may by the competent power recognize and declare the existence of a state of civil war, which will draw after it all the consequences and rights of war between the contending parties, as in the case of a public war. Mr. Wheaton observes, speaking of civil war: 'But the general usage of nations regards such a war as entitling all the contending parties to all the rights of war as against each other, and even as respects neutrals.' "

In the case of the privateersmen of The Savannah, tried in New York under a charge of piracy [case unreported], it was observed by the presiding judge, that "if it were necessary on the part of the government to bring the crime charged in the present case against the prisoners within the definition of robbery and piracy as known to the common law of nations, there would be great difficulty in doing so; perhaps under the counts, certainly upon the evidence. For that shows, if anything, an intent to depredate upon the vessels and property of one nation only, the United States, which falls far short of the spirit and intent that are said to constitute essential elements of the crime." It has already been stated that the prosecutions for piracy against these and other privateersmen were subsequently dropped, and they were admitted to the rights of war, and included in the cartel for the exchange of prisoners.

From the foregoing it is, I think, evident that when a civil war exists, hostilities committed by vessels upon the high seas, under a commission or letter of marque from the insurrectionary government, against the sovereign or citizens of the government against which they have rebelled, are not, by the laws of nations, acts of piracy. A fortiori when the existence of a state of civil war has been recognized by the sovereign through the executive, legislative and judicial departments of his government, and when he has claimed and exercised the rights of war, not only against the insurgents, but in respect to neutrals, by establishing blockades, searching vessels, capturing contraband of war, and condemning jure belli property owned by persons domiciled within the revolted territory, as enemies' property.

It follows that the enterprise for which the schooner Chapman was fitted out was not piratical, within the meaning of that term as defined by the laws of nations. The crime committed by the persons concerned was treason; not merely treason in the sense in which it is committed by those who, within the limits and subject to the de facto authority of the so-called Confederate States government, adhere to the rebellion, but aggravated by the fact that it was committed by persons two of whom were citizens of this state, and the third a foreigner, but all of whom were residing within the undisputed territory of the United States, and receiving the protection of the laws of the Union. Their crime would none the less have been treason if the Confederate States had been a foreign and independent nation, with whom the United States was at war. But the projected enterprise was not, in my judgment, piratical, under the laws of nations, or within the meaning of the act of August 5, 1861.

It follows that the seizure and condemnation of the Chapman and her cargo could not properly have been made under that act, and that the petitioners are not entitled to a share of the proceeds as therein provided. The act by which the vessel was made liable, is the act of August 6, 1861, by which all property intended to be used in aiding, abetting or promoting the existing insurrection, etc., is made liable to seizure and condemnation. The third section provides that in case any person shall file an information with the district attorney, the proceedings shall be for the use of such informer and of the United States in equal parts. The claims of the informer in this case are recognized by the district attorney, and the contest has in effect been between the informer and the officers and crew of the Cyane, who claim half of the proceeds as prize.

For the reasons given above, I am of opinion that the latter are not entitled; but that the proceeds should be divided, after paying the seamen, between the United States and the informer, as directed in the act of August 6, 1861. A claim has been put in by the seamen shipped on board the schooner for their wages. There is no reason to suppose that these men had any knowledge of the guilty nature of the voyage. They were shipped as mariners, and had no connection with the persons placed on board and secreted in the hold of the vessel during the night preceding her departure, and who were to form the crew or fighting force of the privateer. The men were on board the vessel before her seizure. They were detained as prisoners on board the Cyane for a few days, and subsequently as witnesses. But for this latter detention they have been paid as provided by law. I think that they should be allowed one month's pay—to this I understand the United States make no objection.